[Civ. No. 51415. First Dist., Div. Five. Sept. 16, 1983.]

RUE-ELL ENTERPRISES, INC., Plaintiff and Appellant, v.
CITY OF BERKELEY et al., Defendants and Respondents.

## Counsel

Burch Fitzpatrick and Miller, Starr & Regalia for Plaintiff and Appellant.

Natalie E. West, City Attorney, Myron Moskovitz and Ann Juergens for Defendants and Respondents.

## Opinion

**KING, J.**—In this case we hold that a municipality, by virtue of its authority in the exercise of its police power to regulate rents, may require a one-year reduction in rents provided in existing leases on commercial property, measured by a percentage of the landlord's property tax savings resulting from the passage of Proposition 13, without violating constitutional prohibitions against impairment of the obligation of contracts. We further hold that such legislation is not preempted by state law.

Rue-Ell Enterprises, Inc. (Rue-Ell), an owner of commercial property in the City of Berkeley, filed a complaint for declaratory and injunctive relief against the City of Berkeley, its city attorney, and one of Rue-Ell's tenants alleging that the City of Berkeley "Renter Property Tax Relief Ordinance"

of 1978 was unconstitutional as applied to two commercial leases between Rue-Ell and the tenant. After a nonjury trial, the trial court rendered judgment for defendants. We affirm the judgment.

Prior to 1978, Rue-Ell and its tenant entered into leases providing for periodic cost of living increases in rents and for additional payments should taxes on the leased premises be increased. On June 6, 1978, the initiative commonly known as Proposition 13 was passed, adding article XIII A to the California Constitution. Property taxes on the properties in issue were reduced from $23,148 to $8,195 as a result of Proposition 13.[1]

On November 7, 1978, the electorate of the City of Berkeley enacted the Renter Property Tax Relief Ordinance (hereafter Measure I), to remain in effect until December 31, 1979. Measure I contained a preamble stating, in essence, that a shortage of rental property and resulting rent increases had caused a "severe problem" for Berkeley renters and had "endangered the health, safety, and welfare of all Berkeley residents," therefore it was "necessary as well as fair" to provide renters with a portion of the benefits of Proposition 13. The measure required all Berkeley landlords, residential and commercial, to reduce their 1979 rents by an amount equal to 80 percent of their Proposition 13 savings.[2] As a result of Measure I, the rent due Rue-Ell under the leases in issue here, totalling $2,158 per month, was reduced by $199 per month. In January 1979 the tenant asserted its right to the reduction. Rue-Ell then commenced this action.

Rue-Ell's principal contention on appeal is that Measure I is invalid because it violates the contract clauses of the state and federal Constitutions. (U.S. Const., art. I, § 10 ["No State shall . . . pass any . . . law impairing the obligation of contracts . . . ."]; Cal. Const., art. I, § 9 ["A . . . law impairing the obligation of contracts may not be passed."].) Respondents contend it does not.

Rue-Ell argues that Measure I violates the contract clause because an impairment can only be justified by an "emergency," relying on a depression-era decision, *Home Bldg. & L. Assn.* v. *Blaisdell* (1934) 290 U.S. 398, 444 [78 L.Ed. 413, 432, 54 S.Ct. 231, 88 A.L.R. 1481], which approved a Minnesota moratorium on mortgage foreclosure sales, stating that one of five significant factors was that the state legislature had perceived an emergency need to protect homeowners. Rue-Ell also relies on two California

---

[1] In 1978 Rue-Ell owned 10 commercial properties in Berkeley; as a result of Proposition 13 its total property tax liability on these properties was reduced from $63,306 to $18,869.

[2] Measure I permits landlords to increase rents to compensate for certain increased costs (e.g., increases in insurance premiums, maintenance and operating expenses, or capital improvements).

Supreme Court cases, both of which cited the *Blaisdell* "emergency" factor in invalidating laws for unjustified impairments. The court in *Olson* v. *Cory* (1980) 27 Cal.3d 532, 539 [178 Cal.Rptr. 568, 636 P.2d 532], striking down a limit on cost-of-living increases for judges, said "[d]efendants, offering no reason or justification for the state action, fail even to approach their burden of demonstrating the impairment of plaintiff's rights is warranted by an 'emergency' serving to protect a 'basic interest of society.'" The court in *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 312 [152 Cal.Rptr. 903, 591 P.2d 1], invalidating legislation precluding cost-of-living increases for local government employees in excess of increases received by state employees, said "the government has failed to meet its threshold burden of establishing that an emergency existed."

Respondents reply that an impairment may be justified by a "broad, generalized economic or social problem." They rely on *Allied Structural Steel Co.* v. *Spannaus* (1978) 438 U.S. 234, 250 [57 L.Ed.2d 727, 739, 98 S.Ct. 2716], which invalidated a state private pension law, stating that the law "was not even purportedly enacted to deal with a broad, generalized economic or social problem." The court also said that the law "was not enacted to deal with a situation remotely approaching the broad and desperate emergency economic conditions of the early 1930's . . ." (*id.,* at p. 249 [57 L.Ed.2d at p. 739]), but added in a footnote that "[t]his is not to suggest that only an emergency of great magnitude can constitutionally justify a state law impairing the obligations of contracts." (*Id.,* at p. 249 fn. 24 [57 L.Ed.2d at p. 739]; accord, *United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1, 22-23 fn. 19 [52 L.Ed.2d 92, 109-110, 97 S.Ct. 1505].)

The Supreme Courts of the United States and of California have each recently had occasion to analyze further the constitutional prohibition against impairment of the obligation of contracts. After the completion of briefs by the parties herein but before oral argument, the United States Supreme Court decided *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.* (1983) 459 U.S. 400 [74 L.Ed.2d 569, 103 S.Ct. 697]. The defendant in *Energy Reserves* had entered into contracts with the predecessor of plaintiff Energy Reserves Group, Inc. (ERG) to purchase natural gas at a specified price. Thereafter Congress deregulated the natural gas industry. This change in regulation would have permitted unexpectedly high price increases under price "escalator" and "redetermination" clauses contained in the contracts.

In direct response to deregulation, the State of Kansas enacted a law applicable to natural gas contracts executed before congressional deregulation of natural gas. The effect of the Kansas law was to preclude ERG from

obtaining windfall gains which would otherwise have occurred under contracts which did not anticipate congressional deregulation.

The Supreme Court held that the Kansas law did not substantially impair obligations under the contracts, for two reasons. First, at the time the contracts were executed, ERG "did not expect to receive deregulated prices." (*Id.*, 459 U.S. at p. 415 [74 L.Ed.2d at p. 583, 103 S.Ct. at p. 707].) Second, state regulation of the natural gas industry, although not specific as to price, "existed and was foreseeable as the type of law that would alter contract obligations." (*Id.*, 459 U.S. at p. 416 [74 L.Ed.2d at p. 584, 103 S.Ct. at p. 708].) The court concluded, "In short, ERG's reasonable expectations have not been impaired by the Kansas Act." (*Ibid.*, citing *City of El Paso* v. *Simmons* (1965) 379 U.S. 497, 515 [13 L.Ed.2d 446, 458, 85 S.Ct. 577].)

After oral argument in this case, the California Supreme Court decided *Allen* v. *Board of Administration* (1983) 34 Cal.3d 114 [192 Cal.Rptr. 762, 665 P.2d 534]. In rejecting a constitutional and statutory interpretation which would have provided windfall pension benefits for certain retired legislators, the court held that constitutional and statutory revisions confining retirement benefits to those gains reasonably to be anticipated from their employment contracts did *not* constitute an unconstitutional impairment of contracts. (*Id.*, at p. 124, quoting *City of El Paso* v. *Simmons, supra,* 379 U.S. at p. 515 [13 L.Ed.2d at p. 458].)

It is significant that the courts in *Energy Reserves* and *Allen* both found no violation of the constitutional prohibition against impairment of the obligation of contracts where the reasonable expectations of the parties to the contracts at the time of their execution had not been impaired by the subsequent change in the law. On this point the similarities between *Energy Reserves* and the present case are particularly striking. In both cases laws unanticipated at the time contracts were executed rendered those contracts significantly more lucrative. In both cases local laws were then passed restricting the windfall profits available under the contracts: in *Energy Reserves* the seller was prohibited from receiving the full price permitted by the escalator and redetermination clauses, and in the present case Rue-Ell was prohibited from receiving the full amount of rent permitted under the leases. In both cases there had previously been local regulation in the field: residential rent control was adopted in Berkeley in 1972, though later invalidated in *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001].[3] The decision in *Energy Reserves* demon-

---

[3]Admittedly, regulation in the present case was not as pervasive as regulation of the natural gas industry by Kansas. (See *Energy Reserves Group, Inc.* v. *Kansas Power & Light*

strates that a local law reducing the amount of money due under a contract can be considered together with a prior law otherwise resulting in windfall profits under the contract, in determining whether *reasonable expectations* under the contract have been impaired.

■ Any doubts as to whether an emergency is required to justify a state law impairing the obligation of contracts have been resolved by *Energy Reserves* and *Allen.* In the former, citing *Spannaus* and *United States Trust,* the court said that an impairment to be justified "must have a significant and legitimate public purpose . . . such as the remedying of a broad and general social or economic problem. . . . Furthermore, since *Blaisdell,* the court has indicated that the public purpose need not be addressed to an emergency or temporary situation." (459 U.S. at pp. 411-412 [74 L.Ed.2d at p. 581, 103 S.Ct. at p. 705].) Both decisions are consistent with the holdings of the California Supreme Court in *Olson* v. *Cory* and *Sonoma County.* The court in the latter recognized that an emergency is not always required, but explained that the respondents in that case had relied on a fiscal emergency as the only justification for the challenged legislation. (23 Cal.3d at p. 310, fn. 13.) In *Olson* v. *Cory* the opinion did state that an emergency must be shown (27 Cal.3d at p. 539), but that statement was a dictum: the court made clear that the defendants had offered no justification whatever for the state action (*ibid.*).

■ The Supreme Court in *Energy Reserves* described a three-step process for analyzing impairment claims. The first step is to determine whether the state law has "operated as a *substantial impairment* of a contractual relationship." (459 U.S. at p. 411 [74 L.Ed.2d at p. 580, 103 S.Ct. at p. 705], quoting *Allied Structural Steel Co.* v. *Spannaus, supra,* 438 U.S. at p. 244 [57 L.Ed.2d at p. 736]; italics added.) The court noted that "state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment." (459 U.S. at p. 411 [74 L.Ed.2d at p. 580, 103 S.Ct. at p. 705].)

If the state law constitutes a "substantial impairment," the next step is to determine whether the state, in justification, has "a significant and legitimate public purpose behind the regulation . . ., such as the remedying of a broad and general social or economic problem." (*Ibid.*) The court said that "the public purpose need not be addressed to an emergency or temporary situation" (*ibid.*) and added that "[o]ne legitimate state interest is the elim-

---

*Co., supra,* 459 U.S. at p. 414, fn. 18 [74 L.Ed.2d at p. 582, 103 S.Ct. at p. 706].) But existing regulation was only one of two indicators in *Energy Reserves* that there had been no impairment of reasonable expectations; the absence of any expectation of receiving deregulated prices was just as important. Here, the absence of any expectation of receiving the benefits of Proposition 13 is paramount.

ination of unforeseen windfall profits." (*Ibid.*) If a legitimate public purpose is identified, the third inquiry is whether the adjustment of the rights and duties of the contracting parties is based upon "reasonable conditions" and is "of a character appropriate to the public purpose justifying [the legislation's] adoption." (*Ibid.*, quoting *United States Trust Co.* v. *New Jersey, supra*, 431 U.S. at p. 22 [52 L.Ed.2d at p. 109].)

 Applying the *Energy Reserves* approach, the first step is to determine whether Measure I operated as a substantial impairment of the contractual relationship. The trial court properly found no substantial impairment because the combined effect of Measure I and Proposition 13 was to allow landlords to gain a net windfall of 20 percent of their Proposition 13 tax savings in 1979. Although technically altering an obligation of contract, laws restricting a party to gains reasonably to be expected from a contract are not subject to attack under the contract clause. (See *City of El Paso* v. *Simmons, supra*, 379 U.S. at p. 515 [13 L.Ed.2d at p. 458]; *Lyon* v. *Flournoy* (1969) 271 Cal.App.2d 774, 782 [76 Cal.Rptr. 869].) Measure I did not even restrict Rue-Ell to gains it reasonably expected under the leases, but permitted it to retain 20 percent of its unexpected windfall. Additionally, Measure I was only of one year's duration, so Rue-Ell thereafter is the sole recipient of the benefits of Proposition 13.

Having determined that Measure I did not operate as a substantial impairment, it is unnecessary to pursue the second and third steps of the three-step process set forth in *Energy Reserves,* that is, whether there was a significant or legitimate public purpose behind the regulation and, if so, whether the adjustment of rights and duties of the contracting parties is based upon reasonable conditions of a character appropriate to the public purpose justifying the legislation's adoption.

Rue-Ell's final argument on the impairment issue is that another of the five *Blaisdell* factors[4] justifying the Minnesota moratorium, that contract rights were not lost but were merely "deferred," was not present here, and that the trial court erred in failing to consider the absence of this factor. The decision in *Energy Reserves* makes clear, however, that the five factors outlined in *Blaisdell* were not set forth as absolute requirements, but were merely "deemed to be significant" (459 U.S. at p. 410, fn. 11 [74 L.Ed.2d

---

[4]The five significant factors in *Blaisdell*, as described in *Energy Reserves*, were "whether the act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency." (*Energy Reserves Group, Inc.* v. *Kansas Power & Light Co., supra*, 459 U.S. at p. 410, fn. 11 [74 L.Ed.2d at p. 580, 103 S.Ct. at p. 704], citing *Home Bldg. & Loan Assn.* v. *Blaisdell, supra*, 290 U.S. at pp. 444-447 [78 L.Ed. at pp. 432-433].)

at p. 580, 103 S.Ct. at p. 704]) to the court's analysis of the impairment in *Blaisdell.* This conclusion is implicit in the *Energy Reserve* court's omission to state a "deferral of rights" requirement, and is explicit in the court's statement that an "emergency" is not necessary to justify an impairment.

Based upon the foregoing analysis, we hold that Measure I did not substantially impair the obligations of the lease contracts between Rue-Ell and its tenant. Thus, the contract clauses of the state and federal Constitutions were not violated.

■ Rue-Ell's next argument is that Proposition 13 provided direct property tax relief solely to property owners, with renters to benefit only indirectly, therefore the rent rebates mandated by Measure I conflict with Proposition 13 and violate the constitutional prohibition against a city enacting any ordinance in conflict with general laws. (Cal. Const., art. XI, § 7.) The trial court resolved this issue by holding that tenants are "property owners," because a leasehold is an interest in real property under Civil Code section 761 ["estates in real property" include "estates for years"]. Rue-Ell contends this was error.

There is merit to Rue-Ell's challenge to reliance on Civil Code section 761, as the court's reasoning contradicted the contractual underpinnings of modern landlord-tenant theory. The trend is to emphasize the contractual aspects, and deemphasize the real property aspects, of the landlord-tenant relationship. In *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 623-631 [111 Cal.Rptr. 704, 517 P.2d 1168], the Supreme Court relied on this shift in emphasis to hold that residential leases include an implied warranty of habitability, stating that modern urbanization has "undermined the validity of utilizing general property concepts in analyzing landlord-tenant relations . . . ." (*Id.,* at p. 624.)

It was unnecessary, however, for the court to rely on Civil Code section 761. Although Proposition 13 did not include direct relief for renters, such relief is consistent with the initiative. There was evidence presented below that during the campaign for Proposition 13 numerous commentators argued that relief for renters was anticipated if the initiative passed. Ballot arguments also show that relief for tenants in some form was anticipated. Rue-Ell argues there was no indication that mandatory renters' relief was intended by the drafters of Proposition 13; however, such relief is not inconsistent with Proposition 13 and the benefits its proponents predicted for California tenants. Thus, the trial court's reasoning in rejecting Rue-Ell's "conflict" argument was incorrect, but the ruling was proper and should be upheld for the simple reason that relief for property owners was not inconsistent with relief for renters. (See *D'Amico* v. *Board of Medical Examiners*

(1974) 11 Cal.3d 1, 18-19 [112 Cal.Rptr. 786, 520 P.2d 10].) Measure I is not in conflict with general laws and is therefore not violative of article XI, section 7, of the California Constitution.

Rue-Ell further contends that even if Measure I is not in conflict with general laws it legislates in a field preempted by state property tax law. Rue-Ell argues that a pervasive state property tax system and a need for statewide uniformity in the implementation of Proposition 13 demonstrate intent to preempt. (See *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809], disapproved on another point in *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 63, fn. 6 [81 Cal.Rptr. 465, 460 P.2d 137]; *Chavez* v. *Sargent* (1959) 52 Cal.2d 162, 177-181 [339 P.2d 801], disapproved on another point in *Petri Cleaners, Inc.* v. *Automotive Employees, etc., Local No. 88* (1960) 53 Cal.2d 455, 473-475 [2 Cal.Rptr. 470, 349 P.2d 76].) The weakness in this argument is that Measure I does not regulate property taxes. It regulates rents, using property tax relief as a measure for determining rent reductions. Although the title of the ordinance, "Renter Property Tax Relief Ordinance," implies property tax relief for renters, a review of the entire preamble[5] of Measure I makes clear that the focus is on regulation of rents, not property taxes.

Rent control is not a field preemptively occupied by general state law. (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 163 [130 Cal.Rptr. 465, 550 P.2d 1001].) Measure I did use Proposition 13 property tax reductions as the measure of relief, but an activity not directly taxable because of preemption may nevertheless be used as the measure of a permissible tax. (*Cudahy Packing Co.* v. *Minnesota* (1918) 246 U.S. 450, 454-456 [62 L.Ed.2d 827, 830-831, 38 S.Ct. 373]; *U.S. Express Co.* v. *Minnesota* (1912) 223 U.S. 335, 347-348 [56 L.Ed. 459, 466, 32 S.Ct. 211].)

Rue-Ell's uniformity argument is similarly inapposite. Rue-Ell argues that Berkeley renters unfairly received rent reductions in addition to the benefits of post-Proposition 13 tax revenues (see Gov. Code, § 26912) and state funds to offset lost revenues (see Stats. 1978, chs. 292 & 332), unlike other

---

[5]The preamble states: "The passage of Proposition 13 on June 6, 1978 has provided some property tax relief to homeowners and owners of rental property without providing any tax relief to renters. *The shortage of affordable rental property in the City of Berkeley, and rising rents resulting from this shortage, has produced a severe problem* for a significant proportion of residential and commercial Berkeley renters, and has endangered the health, safety and welfare of all Berkeley residents. *In view of this serious problem, it is necessary as well as fair that renters be provided with a portion of the benefits of the property tax resulting from Proposition 13.* Therefore, the purpose of this Ordinance is to ensure that renters, who have shared the burdens of property taxes, will receive a fair share of the benefits of property tax reductions on rental property established by the passage of Proposition 13, enacting Article XIIIA of the Constitution of the State of California." (Italics added.)

Alameda County renters, who were not able to offset their losses in services with rent reductions. But Measure I does not regulate property taxation, it reduces rents pursuant to an expressly asserted rental-oriented purpose. The California Supreme Court, in holding that rent control is not an area preemptively occupied by general state law (*Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at p. 163), has indicated that there is no need for uniformity in this area.

Rue-Ell also argues that the post-Proposition 13 increase of the renters' state income tax credit from $37 to $137 (Rev. & Tax. Code, § 17053.5) demonstrates legislative intent to provide renter property tax relief as part of a pervasive state system of property taxation. This increase, however, is no more likely intended to provide complete relief for renters than is the $14 income tax credit for blind persons intended to compensate totally for the special costs of being blind.

Finally, Rue-Ell claims error by the trial court's admission of five hearsay writings into evidence to prove a shortage of commercial rental space. It is unnecessary to determine whether the documents were admissible, for any error was clearly harmless. ■ A verdict or finding cannot be set aside on the basis of erroneous admission of evidence if the error did not result in a miscarriage of justice. (Evid. Code, § 353; see Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Such error is not prejudicial if the evidence "was merely cumulative or corroborative of other evidence properly in the record," or if the evidence "was not necessary, the judgment being supported by other evidence." (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 303, at p. 4286.) A review of the record reveals that the disputed evidence was merely cumulative and corroborative and the judgment was amply supported by other evidence. No miscarriage of justice is evident.[6]

The judgment is affirmed.

Low, P. J., and Haning, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 10, 1983. Grodin, J., did not participate therein.

---

[6]The analysis contained in our previous discussion of the preemption and impairment issues responds to Rue-Ell's contention that Measure I violates due process, and will not be repeated.